FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ FEB 15 2013 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------X

MONA KANCIPER,

          Plaintiff,

   -against-

Leonard Lato,

         Defendant.

------------------------------------

**JURY TRIAL DEMANDED**

CV 13- No.  0871

**COMPLAINT**

SPATT, J.

    Plaintiff Mona Kanciper ("Kanciper" or "plaintiff") by her attorneys McLaughlin & Stern, LLP, as and for her Complaint against the defendants, alleges the following:

**PRELIMINARY STATEMENT**

    1. This is a civil rights action to vindicate plaintiff's rights under the Fourteenth Amendment of the Constitution of the United States and the Civil Rights Acts, 42 U.S.C. 1983, et seq.

    2. This case raises questions concerning the actions of a rogue and unscrupulous former assistant district attorney who used his rank and prejudices to surreptitiously take over the criminal investigation of Kanciper (when that investigation was initially assigned to another bureau which decided not to pursue the matter) based upon an undisclosed close personal

1

relationship with William Wexler ("Wexler"), a long-time board member of the referring agency.

3.    In pursuit of his unlawful agenda, Leonard Lato ("Lato") knowingly drafted and aided in the execution of two legally defective search warrants that were, as a matter of law, outside the scope and legal jurisdiction of the referring agency.

## JURISDICTION AND VENUE

4. This Court has jurisdiction of the action pursuant to 28 U.S.C. 1331 and 1343 and 42 U.S.C. 1983, as this is a civil rights action arising under the United States Constitution and the laws of the United States.  This Court has jurisdiction over the supplemental claims arising under New York State law pursuant to 28 U.S.C. 1367(a).

5. Venue properly lies in this judicial district pursuant to 28 U.S.C. 1391(b), because the plaintiff and defendants reside in Suffolk County, New York.

## PARTIES

6. Kanciper is a resident of the State of New York, County of Suffolk.  She owns and resides on a 50-acre horse farm located at 15 South Street Manorville, New York 11949 (the "horse farm").  Among other things, the horse farm rescues and

2

is a safe-haven for discarded and unwanted horses.  Since 1998, the horse farm has rescued over 1,500 horses many of which were bound for auction kill buyers.

7. At all times relevant herein, Leonard Lato ("Lato") was a resident of Suffolk County, an assistant district attorney in the Suffolk County District Attorney's Office and bureau chief of the Insurance Crimes Bureau and, during such time, maintained a close personal relationship with William Wexler ("Wexler"). At all times herein, Wexler was a close personal friend of Lato and one of 5 board members of the Suffolk County Society for the Prevention of Cruelty to Animals (SPCA), a private not-for-profit corporation.  The SPCA was the agency that was initially investigating Kanciper.  Pursuant to New York State law, the SPCA is only permitted to investigate and enforce Article 26 of the Agriculture and Markets Law (the animal cruelty laws).

**STATEMENT OF FACTS**

**The Residence and Horse Farm**

8. Since 1998, Kanciper individually and through a not-for-profit corporation called New York Horse Rescue Corporation, used the horse farm to give aid and shelter to ill, abandoned, and otherwise discarded horses.

3

9. Kanciper lives on the horse farm with her two young children. Kanciper and her staff rehabilitate horses. These horses are subsequently adopted by families, live the remainder of their lives on the horse farm, or are trained and used to provide horseback riding lessons to children.

10. Kanciper's now-deceased husband was a renowned equine veterinarian who worked at Aqueduct and Belmont racetracks who acted as the horse farm's resident veterinarian and administered medical care to the horses.

11. While working at Belmont Racetrack on July 12, 2009, Kanciper's husband was struck by a loose galloping horse and suffered a catastrophic cervical injury. As a result of those injuries, he died on December 6, 2009.

**SPCA's First Investigation of Kanciper**

12. On or about August 5, 2009, Ann Studer (one of a group of women who had a personal vendetta against Kanciper) called the SPCA to make a complaint concerning alleged dog/equine abuse at the horse farm.

13. SPCA assigned Shawn Dunn, a part-time volunteer, to investigate.

14. Prior to this complaint, no complaint has ever been lodged against the horse farm, Kanciper or her husband.

4

15.   After completing his investigation, Shawn Dunn closed the case file against Kanciper and her husband in December 2009 finding no probable cause that Kanciper or her husband were abusing horses or any other animal.

**SPCA's Second Investigation of Kanciper**

16.   On or about December 23, 2009, the SPCA received a complaint from Annemarie Fergo ("Fergo"), part of the group of women that had a personal vendetta against Kanciper.   Fergo alleged that Kanciper was neglecting her horses.

17.   On Christmas Day, December 25, 2009, Michael Norkelun ("Norkelun"), a part-time volunteer at the SPCA, made an unannounced visit to the horse farm to question Kanciper.

18.   After looking at the horses, Norkelun deemed the complaint unfounded and was ready to close the investigation. According to Norkelun, approximately 80% of the complaints called into the SCPA are unfounded.

19.   In his official report, Norkelun wrote that Kanciper "did show this officer several horses inside a large barn that appeared healthy".

20.   Notwithstanding the fact that Norkelun had found no evidence of wrongdoing at the horse farm, Fergo and Studer (as well as a couple of other women who were once friends with

5

Kanciper), lobbied the SPCA to continue its investigation of Kanciper.

21. Norkelun continued his investigation of Kanciper by, among other things, having Fergo (who was not associated with the SPCA) collect written statements from other women who also had personal vendettas and biases against Kanciper. Neither Lato nor Norkelun (nor their supervisors or subordinates) ever interviewed these complainants face-to-face in connection with their investigation of Kanciper.

22. Regardless of the veracity of their statements (rife and riddled with hearsay), their motivation to fabricate, and Norkelun and Dunn's personal and repeated observations to the contrary, Norkelun went forward with the investigation and submitted his findings to the Suffolk County District Attorney's Office (Case Advisory Bureau a/k/a "CAB") for further investigation in or around January 2010. At that time, Edward Jablonski ("Jabloknski") was the chief of the bureau.

**District Attorney's Office Decides Not To Investigate Kanciper**

23. CAB is a non-trial bureau within the Suffolk County District Attorney's Office which drafts search warrants and investigates borderline felony cases. All proposed search

6

warrants must be reviewed by a supervisor in CAB prior to having a judge sign off on it.

24.  Jablonski reviewed the investigative materials provided by the SPCA and determined that the evidence against Kanciper was stale, insufficient and ridden with hearsay. Jablonski, on behalf of the District Attorney's Office, decided to end the investigation of Kanciper and to not apply for a search warrant.  At which point, the investigation of Kanciper should have ended there.

25.  However, the SPCA was frustrated and disgruntled when the District Attorney's Office declined to further investigate Kanciper.  The SPCA was fearful of potential negative publicity from the complainants who had threatened to contact the then county executive, Steven Levy, as well as rescue groups to complain about the inadequacy of the SPCA.  Furthermore, the SPCA believed that the case was "going to be big" and would be newsworthy and that the SPCA would be prominently featured thereby increasing public donations.  According to an email dated January 29, 2010 from Norkelun to his supervisor at the SPCA: "… I'm just impatient to get [Kanciper]."

26.  As a result, in or around mid-February 2010, Gerald Lauber ("Lauber"), a "facebook friend" of Lato and a close

7

friend of Wexler, fellow SPCA board member with Wexler, and
Secretary and Chief of Detectives at the SPCA, reached out to
Lato.  Lauber requested that Lato investigate Kanciper using the
resources of the District Attorney's Office.

27.  At that time, Lato, Lauber, and upon information and
belief Wexler, all knew that CAB had previously declined to
further investigate Kanciper or seek a search warrant against
her.

28.  Upon information and belief, it is the District
Attorney's Office's policy that once one bureau chief (like
Jablonski) decides not to further investigate a case, another
bureau chief (like Lato) may not override that decision.

29.  Nevertheless, Lato, based upon his personal long-time
friendship with Wexler and malice towards Kanciper, was
determined to continue the criminal investigation of Kanciper in
violation of the District Attorney's Office's policy and stale,
hearsay ridden and legally insufficient evidence.

**Lato Unlawfully Investigates Kanciper**

30.  After two prior closed SPCA investigations against
Kanciper, CAB's (the appropriate bureau at the District
Attorney's Office that handles these types of cases) decision
not to investigate her, and an office policy to the contrary,

8

Lato decided to investigate Kanciper and in the process ruin her reputation and livelihood.

31.  At all relevant times, Lato was chief of the Insurance Crimes Bureau and the allegations against Kanciper had nothing to do with insurance.  That is why the investigation was assigned to CAB and why Lato surreptitiously took it over.

32.  After Lato unilaterally took on the criminal investigation of Kanciper, Jablonski learned of it and spoke with Lato about it.  At no time did Lato disclose his personal relationship with Wexler or Wexler's relationship with the SPCA.

33.  Lato, from in or around February through March 2010, conducted a criminal investigation of Kanciper together with the SPCA.  As set forth more fully below, Lato directed and participated in the unlawful search of Kanciper's home and property and the seizing of her personal items.  Lato instructed Norkelun on the method and manner in which Norkelun furthered the investigation of Kanciper.  Norkelun failed to interview a majority of the women complaining about Kanciper and had one of these women collect statements from her friends (the other complainants) and fax/mail them to him without ever meeting them in person or otherwise exploring the veracity of their allegations.  These investigative techniques were condoned by

9

Lato who accepted all of the allegations against Kanciper as true despite never having interviewed the complainants.

34.   In or around early March 2010, Lato prepared a search warrant for the SPCA to search Kanciper's farm for evidence of animal cruelty and endangering the welfare of a child (Penal Law §260.10(1)).

35.   However, for decades, it is clearly established law and any reasonable person would know that the SPCA cannot investigate any matters outside of animal cruelty.   The SPCA does not have plenary police powers.   SPCA agents cannot investigate or enforce child endangerment statutes such as Penal Law §260.10(1).   The scope of the SPCA's investigatory and law enforcement powers is limited to Article 26 of the Agriculture and Markets Law.   SPCA peace officers are not police officers.

36.   Notwithstanding the SPCA's limited scope of jurisdiction regarding the animal cruelty laws, Lato (in his zeal to investigate Kanciper and further his close personal friendship with Wexler) drafted both an affidavit in support of a search warrant for Norkelun and a proposed search warrant for the local court (the "Warrant Material") purportedly pursuant to Criminal Procedure Law §690.   Lato further advised the SPCA that it had probable cause to search Kanciper's property.

10

37.   The Warrant Material requested, among other things, that the SPCA be permitted to search Kanciper's horse farm to find evidence of endangering the welfare of a child, a subject matter clearly outside the parameters of the SPCA's jurisdiction.

38.   According to John Thompson, a "Lieutenant" with the SPCA and the "Officer in Charge" of the execution of the search warrant, the SPCA does not investigate child endangerment cases and if the SPCA should see evidence of child abuse, they would refer the matter to Child Protective Services, a New York State agency.

39.   Lato finalized the Warrant Material on March 18, 2010 and informed Norkelun on where to take it and how to get it signed by the local magistrate because Norkelun had never applied for a warrant on his own before.

40.   In addition to drafting the Warrant Material on matters beyond the legal scope of the SPCA's jurisdiction, Lato also misrepresented the status of Norkelun therein.   Norkelun is a part-time volunteer/peace officer with the SPCA.   However, Lato represented to the local court that Norkelun was a public officer/police officer by referring to Norkelun as "Detective Michael Norkelun, Shield No. 139" in an effort to secure the

11

warrant under Criminal Procedure Law §690 (Criminal Procedure Law §690 does not apply to peace officers such as Norkelun). Norkelun furthered the misrepresentation by introducing himself to the judge as "Detective Norkelun", wearing a fully loaded Glock 19 on his hip which he purchased from a private party for approximately $300, and a badge around his neck that the SPCA purchased for him from a private store bearing the New York State Device of Arms (which, according to the head of the SPCA, New York State did not authorize the SPCA to use its seal).

41. Lato also misrepresented the size of the horse farm in the Warrant Material. Lato wrote that the horse farm was approximately 4 acres. The horse farm is approximately 50 acres. Upon information and belief, Lato intentionally misrepresented the size of the horse farm so the local court would approve it as-is and not require any further specificity in connection with the areas on the farm to be searched.

42. On or about March 18, 2010, Norkelun received the Warrant Material drafted by Lato and went to the Suffolk County District Court (First District) as directed by Lato.

43. After reviewing the Warrant Material and meeting "Detective Norkelun", the local judge signed the warrant.

44. On March 20, 2010, Norkulen, Lato and more than a dozen other members of the SPCA arrived unannounced at the horse farm to execute the search warrant. No member of the Suffolk County Police Department or District Attorney's Office (besides Lato) took part in the search.

45. During the course of the search, Lato determined that the SPCA had probable cause to search Kanciper's home and personal items therein including bank statements, retirement accounts, and vacation plans. As a result, Lato drafted another warrant for the SPCA to search Kanciper's residence (the "Piggy-Back Warrant").

46. Lato drafted the Piggy-Back Warrant within a few hours and delivered it to Norkelun on the horse farm.

47. Lato unlawfully aided in the execution of the initial warrant by searching Kanciper's barn and property for almost an hour without any legal authority to do so.

48. Norkelun then went back to the local court to get the Piggy-Back Warrant signed by the judge so he could search Kanciper's home.

49. The Piggy-Back Warrant drafted by Lato suffered from the same legal infirmities as the first Warrant Material:

13

(a) Norkelun was not legally authorized to request a search warrant under Criminal Procedure Law §690;

(b) The warrant gave the SPCA authority to investigate and enforce penal statutes which were clearly outside the scope of their limited jurisdiction to investigate animal cruelty laws; and

(c) The warrant misrepresented the size of the horse farm and Norkelun's status as a "Detective".

50. Notwithstanding these infirmities, the local judge signed the Piggy-Back Warrant on March 20, 2010 and Norkelun returned to plaintiff's premises, entered her home and searched and seized her personal property as directed by Lato.

51. The two warrants drafted by Lato were executed over the course of 10 hours on March 20, 2010 (from 8:00am – 6:00p.m.). SPCA, acting in concert with Lato, searched 50 acres of plaintiff's property, dug up large plots of land throughout the horse farm, caused significant property destruction, searched and seized items from plaintiff's home, kept plaintiff separated from her two small children for hours, and publicly humiliated her without legal justification.

52. At no time during Lato's investigation of Kanciper was a criminal prosecution or court proceeding pending against her.

14

In fact, CAB had already determined to cease investigating Kanciper.

53. Several months later, Kanciper went to trial on 2 counts of endangerment of a minor and 3 counts of animal cruelty.

54. At no time did Lato ever offer or recommend a plea bargain to Kanciper.

55. Ultimately, Kanciper was acquitted on all of the charges against her.

56. Due to a falling out with Thomas J. Spota III, Lato resigned from the District Attorney's Office.

## FIRST CAUSE OF ACTION
### (Violation of 42 U.S.C. 1983)

57. Kanciper repeats and realleges each and every allegation above as if set forth in full herein.

58. Lato, acting under color of state law subjected Kanciper, a citizen of the United States, to a deprivation of her Federal constitutional rights.

59. While acting under color of state law, Lato violated plaintiff's civil rights by conducting an unlawful investigation against her including:

15

(a) knowingly drafting the Warrant Material and Piggy-Back Warrant for the SPCA on matters clearly outside the scope of the SPCA's law enforcement jurisdiction in violation of the Fourth and Fifth Amendments and well-rooted New York State law including Article 26 of the Agriculture and Markets Law and Criminal Procedure Law §§ 690.05 and 690.25;

(b) unlawfully executing the unlawful search warrant on behalf of the SPCA in violation of the Fourth and Fifth Amendments and well-rooted New York State law including Article 26 of the Agriculture and Markets Law and Criminal Procedure Law §§ 690.05 and 690.25; and

(c) unlawfully misrepresenting in the Warrant Material that Norkelun was "Detective Michael Norkelun, Shield No. 139" and the size of the horse farm in violation of the Fourth and Fifth Amendments and well-rooted New York State law including Article 26 of the Agriculture and Markets Law and Criminal Procedure Law §§ 690.05 and 690.25;

(d) intentionally disregarding the District Attorney's Office's policy by surreptitiously taking over the investigation of Kanciper from CAB after CAB had decided not to pursue it based upon a lack of evidence;

16

(e) willfully directing Norkelun to violate the scope of his jurisdiction and the Criminal Procedure Law in his investigation of Kanciper;

60. Lato's action in both investigating and directing the investigation of Kanciper were not objectively reasonable.

61. Lato showed a complete disregard for plaintiff's rights.

62. Punitive damages are warranted against Lato to deter this type of conduct in the future.

63. Plaintiff suffered substantial economic, reputation, and emotional damages as a result of Lato's constitutional violations against her.

64. As a result, Kanciper is entitled to an award of compensatory damages, punitive damages, costs, disbursements and attorneys' and expert fees against the defendant in the sum of no less than $5,000,000 for violating her civil rights pursuant to 42 U.S.C. 1983, et seq.

17

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests the following relief:

1.  On the First Cause of Action, an award of compensatory damages, punitive damages, costs, disbursements and attorneys' and expert fees in favor of plaintiff and against the defendant in the sum of no less than $5,000,000.00 including, *inter alia*, compensatory and economic damages for violating plaintiff's civil rights pursuant to 42 U.S.C. 1983, et seq.; and

2.  On all causes of action, that this Court order any further relief that it deems appropriate.

## JURY DEMAND

Plaintiff, pursuant to Federal Rule of Civil Procedure 38, demands a trial by jury.

Dated:    New York, New York
          February 16, 2013


                              McLAUGHLIN & STERN, LLP


                              By: _____/s/_____
                              Steven J. Hyman
                              Alan E. Sash
                              260 Madison Avenue
                              New York, NY 10016
                              (212) 448-1100
                              *Attorneys for Plaintiff*


                              18